## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

GUILHERME B.V.,                                   :
                                                  :
              Petitioner,                         :        Civ. No. 20-11734 (KM)
                                                  :
        v.                                        :
                                                  :
JOHN TSOUKARIS, *et al.*,                          :        **OPINION**
                                                  :
              Respondents.                        :
---                                               :

### KEVIN MCNULTY, U.S.D.J.

#### I.        INTRODUCTION

Petitioner, Guilherme B.V.,[1] is an immigration detainee currently held at Essex County Correctional Facility ("ECCF"), in Newark, New Jersey. He is proceeding by way of counsel with a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241, as well as a Motion for a Temporary Restraining Order ("TRO"). (DE 1; DE 2.)[2] Both filings seek Petitioner's immediate release from detention based upon the current COVID-19 pandemic and Petitioner's underlying health conditions. Respondents oppose both the petition and motion for a TRO. (DE 9.) Pursuant to Local Civil Rule 78.1, this matter is decided without oral argument. For the reasons set forth below, the petition and motion will be denied.

---

[1]       Consistent with guidance regarding privacy concerns in social security and immigration cases by the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Petitioner is identified herein only by his first name and last initial.

[2]       Although Petitioner classifies his motion as one for an immediate temporary restraining order, I treat it as one for a preliminary injunction. *See Hope v. Warden York Cty. Prison*, No. 20-1784, - F.3d -, 2020 WL 5001785, at *1 (3d Cir. Aug. 25, 2020) (noting orders that released immigration detainees due to COVID-19 pandemic were in effect mandatory preliminary injunctions).

## II.    BACKGROUND

### A.    Procedural History

Petitioner is a 38-year-old native and citizen of Brazil. (DE 9-7 at 1.) Petitioner entered the United States in 2005 and has resided here since that time. (DE 1-10 at 6.) In June 2011 Petitioner was arrested and charged with simple assault and terroristic threats. (DE 9-7 at 3.) All charges were later dismissed. (*Id.*) However, on June 20, 2011, while at the Monmouth County Correctional Center, Petitioner encountered Immigration and Customs Enforcement ("ICE"). (*Id.* at 2.) After ICE officers determined that Petitioner had entered the United States without first having been inspected or paroled, they issued him a Notice to Appear ("NTA"), took him into ICE custody, and placed him in removal proceedings. (*Id.* at 2–3.)

On September 21, 2011, an Immigration Judge ("IJ") released Petitioner from custody on $7,500 bond. (*Id.* at 3.) On August 12, 2015, Petitioner was arrested on domestic violence charges and his bond was revoked. (*Id.*; DE 9-10 at 4.) He was subsequently re-detained by ICE. (DE 9 at 16.) On March 23, 2016, an IJ released Petitioner on $10,000 bond. (DE 9-7 at 3.) Petitioner was re-arrested on March 31, 2019 and charged with terroristic threats and possession of a weapon. (*Id.* at 2–3.)[3] On September 10, 2019, an IJ denied Petitioner's request for bond, finding that he was a danger to the community and presented a risk of flight. (DE 9-8.) According to Respondents, Petitioner reserved the right to appeal the IJ's decision on bond, but does not appear to have ever appealed the decision. (DE 9 at 16.)

On November 21, 2019, an IJ ordered Petitioner removed from the United States. (DE 9-9.) The IJ denied Petitioner's application for withholding of removal under the Section 241(b)(3)

---

[3]     The status of Petitioner's charges from August 12, 2015 and March 31, 2019 is unclear. Although Petitioner states that these charges have been dismissed, the document Petitioner cites to in support of that contention lists some of those charges as "still pending." (DE 11 at 11; DE 9-7 at 2–3.)

of the Immigration and Nationality Act ("INA"), as well as his application for withholding of removal under the Convention Against Torture. (*Id.*) Petitioner appealed the decision to the Board of Immigration Appeals ("BIA"), but later withdrew that appeal. (DE 9-10 at 2.) He remains detained pursuant to a final order of removal under 8 U.S.C. § 1231(a)(6).  Respondents state that since May 2020, Petitioner has failed to comply with the Government's efforts to deport him. (DE 9 at 16–17; DE 9-11.) As a result, Petitioner has been issued at least two Notices of Failure to Comply pursuant to 8 C.F.R. § 241.4(g). (DE 9-11.) These apparently relate to the ministerial acts required to obtain the necessary travel documents required for removal.

On August 27, 2020, Petitioner filed the instant habeas petition and motion for a TRO seeking his immediate release from detention. (DE 1; DE 2.) Petitioner argues that, given his underlying health conditions, his continued confinement at ECCF during the current pandemic violates his Fifth and Fourteenth Amendment Due Process rights. (DE 1 at 29.) On September 2, 2020, Respondents filed opposition to both the petition and motion for a TRO. (DE 9.) Petitioner thereafter filed a reply. (DE 11.) The matter is now fully briefed and ripe for disposition.

**B.**     **Petitioner's Health**

Pertinent to this matter is Petitioner's health and medical history. Petitioner suffers from multiple medical conditions, including obesity, a history of smoking, moderate asthma, and a mood disorder. (DE 1 at 22–23.) In support of his petition, Petitioner provided a declaration from Dr. Kim Griswold who reviewed Petitioner's medical records and opines on whether Petitioner's medical history creates a risk that he will suffer significant harm or death if infected by COVID-19. (DE 3.)

With respect to Petitioner's obesity, his medical records reveal that he has a Body Mass Index ("BMI") of 33.7. (*Id.* at 8; DE 10-1 at 263.) Dr. Griswold states that obesity is defined as a

BMI of 30 or above, and that the Centers for Disease Control ("CDC") has identified obesity as a condition that places individuals at increased risk for severe illness from COVID-19. (DE 3 at 8); *see also* Ctrs. for Disease Control and Prevention, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Sept. 14, 2020). Dr. Griswold also cites to research which indicates obesity "is a major risk factor for complications from COVID-19." (DE 3 at 8.)

As for Petitioner's history of smoking, Dr. Griswold asserts this history also places Petitioner at high risk for serious illness or death from COVID-19. (*Id.* at 9.) Petitioner's medical records indicate that he smoked a pack of cigarettes a day for twenty-five years. (DE 10-1 at 140.) Dr. Griswold states that smoking on its own causes damage to the respiratory system and there is "evidence to suggest that smoking is associated with adverse outcomes in COVID-19, including death." (DE 3 at 9.) Dr. Griswold also submits that Petitioner's medical records reveal a diagnosis of Chronic Obstructive Pulmonary Disease ("COPD"), which is often the result of long-term tobacco use and is a "known risk factor for COVID-19." (*Id.*; DE 10-1 at 223–26, 242–45.) The Court notes that the CDC has also listed COPD as a medical condition which places an individual at increased risk of severe illness from COVID-19. *See* Ctrs. for Disease Control and Prevention, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Sept. 14, 2020).

As for Petitioner's asthma, Dr. Griswold states that Petitioner does suffer from moderate asthma, a condition which the CDC has recognized might be associated with an increased risk of severe illness from COVID-19. (*Id.* at 10); *see also* Ctrs. for Disease Control and Prevention, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-

extra-precautions/people-with-medical-conditions.html (last visited Sept. 14, 2020).[4] Dr. Griswold cites to the American Lung Association who "confirms that children and adults with asthma are at higher risk of complication [if infected]." (DE 3 at 10.) Dr. Griswold opines that the combination of Petitioner's history of moderate asthma, history of smoking, and COPD place him at even higher risk of serious illness from COVID-19. (*Id.*)

Finally, with regard to Petitioner's mood disorder, Dr. Griswold states that Petitioner's "diminished mental health makes him more vulnerable to serious health complications because it undermines his immune system." (*Id.* at 9.) Additionally, Dr. Griswold states that the medications Petitioner takes for his mental health conditions can also weaken his immune system, thereby creating further risk of serious illness from COVID-19. (*Id.*)

Dr. Griswold concludes her declaration by stating that the only way to adequately protect Petitioner from the risk that COVID-19 presents is to release him from detention. (*Id.* at 11.)

**C.    Conditions at ECCF**

*i.    Respondents' Evidence Regarding the Conditions at ECCF*

Also pertinent to this petition are the conditions of confinement at ECCF. To describe the measures Respondents have undertaken to thwart the spread of COVID-19 at ECCF, Respondents provide the declaration of Alfaro Ortiz, the director of the facility. (DE 9-5.) Mr. Ortiz states that since early March 2020, ECCF has enacted numerous measures to ensure the health and safety of detainees during the COVID-19 outbreak. (*Id.* at 4.) The protocols are lengthy and detailed, and I summarize them only briefly.

---

[4]    I note that CDC guidance currently provides two categories of medical conditions related to COVID-19: conditions that *do* place individuals at increased risk of severe illness from COVID-19 and conditions that *might* place someone at increased risk. *See* Ctrs. for Disease Control and Prevention, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Sept. 14, 2020). While obesity and COPD fall within the first category, moderate asthma falls within the second. *Id.*

Currently, ECCF houses approximately 74% of its maximum capacity. (*Id.* at 1–2.) Detainees are housed separately from inmates. (*Id.* at 1.) Each detainee housing unit can hold approximately 60 people, but that number has been reduced to 48 in the wake of COVID-19. (*Id.* at 2.) Each cell within the housing unit contains two bunk beds. (*Id.*) The bunk beds are not, however, spaced six feet apart "based on how the beds are constructed." (*Id.*) The cells are located around the perimeter of the housing unit and in the center of the unit there is a seating area and recreation area. (*Id.*) The spacing within the units allows for detainees to practice social distancing of the recommended six feet. (*Id.*)

Since the COVID-19 outbreak, meals are provided to detainees within their cells or in the recreation area of the housing unit in order to avoid congregating. (*Id.* at 6.) ECCF has modified recreation groups to limit close interaction with other detainees and has reduced the number of individuals permitted to take recreation at the same time in order to foster social distancing. (*Id.* at 8.) Staff regularly remind detainees to maintain social distance if they observe detainees not doing so. (*Id.* at 3.) The facility has educated detainees in multiple languages and formats about COVID-19 and best practices to prevent the spread of the virus. (*Id.* at 11.) There are signs posted throughout the facility, public service announcements are played on video screens, and live and video presentations are given about COVID-19. (*Id.* at 2, 11.) Staff interacting with detainees wear masks at all times. (*Id.* at 9.)

ECCF has hired additional staff to increase the cleaning and sanitizing of their facility. (*Id.* at 6.) Each housing unit is sanitized no fewer than "three times per day." (*Id.*) The common spaces and equipment are regularly sanitized, and communal telephones and tablets are cleaned between uses by a "designated detainee" who is supervised by ECCF staff. (*Id.* at 11.) Toilets are also

cleaned between uses by designated cleaners. (*Id.*) Cleaning agents are available in the communal showers for detainees to clean the areas themselves between uses. (*Id.*)

For safety and security reasons, the facility does not provide hand sanitizer to detainees. (*Id.* at 10.) However, detainees have "free access to soap." (*Id.*) Detainees have unlimited access to soap and water, and some detainees keep multiple bars of soap in their personal areas. (*Id.* at 14.) ECCF receives deliveries of soap every three days and detainees are permitted to have four or five bars of soap at a time. (*Id.* at 14–15.) The facility is encouraging detainees to use soap as frequently as possible and individuals can request additional soap at any time. (*Id.* at 15.) Disinfectant spray is available for detainees to use upon request. (*Id.* at 14.) Since disinfectant spray contains bleach, and therefore can be a safety/security hazard, detainees may not keep the disinfectant spray with them. (*Id.*) However, at the beginning of every shift, each correctional officer is issued a bottle of disinfectant spray to use throughout their shift. (*Id.* at 15.) The spray bottle is replenished as necessary and ECCF is encouraging staff and detainees to use the spray often and liberally. (*Id.*)

As for medical care, ECCF is following the testing guidance issued by the CDC. (*Id.* at 12.) Detainees who complain of illness are "immediately evaluated by medical staff." (*Id.*) If a detainee exhibits signs or symptoms of COVID-19, they are provided with a surgical mask. (*Id.*) Individuals with moderate to severe symptoms are transported to the local hospital for evaluation. (*Id.*) Individuals with mild symptoms are placed in a designated quarantine area. (*Id.*) Anyone who is symptomatic and awaiting test results is started on anti-viral medications and their vitals are monitored on a daily basis. (*Id.* at 13.)

As of August 26, 2020, there are 21 inmates and detainees in quarantine. (*Id.* at 13.) ECCF is taking a "proactive" approach to quarantine and is quarantining anyone: (1) who was in close

contact with an officer or staff member who tested positive for COVID-19; (2) who was in close contact with a detainee or inmate who tested positive; (3) who was in close contact with a detainee or inmate who reported symptoms; (4) exhibits mild symptoms themselves; or (5) tested positive pursuant to ECCF's rapid antibody screening. (*Id.*) Those in quarantine are placed in single occupancy cells which have closed walls and doors. (*Id.*)

Detainees who are asymptomatic but have been exposed to someone with confirmed COVID-19 are housed together in a practice referred to as "cohorting." (*Id.*) If, after fourteen days, no new cases develop, cohorting is discontinued. (*Id.*) ECCF has conducted medical reviews of each detainee at ECCF and those with chronic conditions that place them at higher risk for severe illness if infected are placed in a "special needs unit if those conditions are not well controlled." (*Id.* at 18.) If a detainee's condition is well-controlled, they remain in the general population. (*Id.*)

Mr. Ortiz's declaration states that as of August 23, 2020, the following is a cumulative list of individuals that have tested positive for COVID-19 at ECCF: eight ICE detainees; 21 county inmates; 97 members of the ECCF correctional staff; and four members of the civilian staff. (*Id.* at 17.) That list, as noted is cumulative since the beginning of the COVID-19 outbreak. There have been no new positive cases among detainees for the past 12 weeks, among inmates for the past six weeks, among correctional staff for the past two weeks, or among civilian staff for at least 15 weeks. (*Id.*)

### ii. *Petitioner's Evidence Regarding the Conditions at ECCF*

To describe the conditions that he is personally experiencing at ECCF, Petitioner provides his own declaration dated August 18, 2020. (DE 1-10.)[5] I summarize his statement briefly.

---

[5]     Petitioner has also submitted the declaration of Ms. Rosa Santana who works with immigration detainees at ECCF and is familiar with the facility, as well declarations from Dr. Rupa Patel, who is an infectious diseases specialist and who opines as to the effectiveness of ECCF's COVID-19 protocols. (DE 1-1; DE 1-11; DE 11-1.)

Petitioner is currently sharing a cell with another detainee. (*Id.* at 4.) He states that there is no room to socially distance from his cellmate and that the bunk beds are arranged "less than a meter apart" so he and his cellmate "must be very close together when we sleep." (*Id.*) When permitted time in the common area, Petitioner states there are often 30 to 40 men in the area who are not practicing social distancing and are not wearing masks. (*Id.*) Petitioner states that a detainee only receives a mask if they are assigned to a special duty, such as cleaning. (*Id.*)

Petitioner states that the detainees share communal items, but he rarely observes the other detainees using the available cleaning supplies to sanitize the items after use. (*Id.*) Petitioner has received some cleaning supplies for his cell, but the water provided is "not always changed between cells and is often very dirty." (*Id.*) Petitioner states that only a few of the guards wear face masks, and he fears coronavirus will spread because the guards "go in and out of the jail every day and are exposed to new places where they may get coronavirus." (*Id.* at 5.) Petitioner is fearful of contracting COVID-19 but states that even if he remained inside his cell all day to avoid interaction with others, he would still be unable to socially distance himself from his cellmate. (*Id.* at 4.)

### III.   JURISDICTION

Historically, conditions of confinement claims have been brought pursuant to 42 U.S.C. § 1983, seeking damages or amelioration of those conditions by injunction. *See Camacho Lopez v. Lowe*, Civ. No. 20-563, 2020 WL 1689874, at *4–5 (M.D. Pa. Apr. 7, 2020). However, "[w]here a petitioner seeks release from detention, habeas (not a § 1983 action seeking release) is proper." *Hope*, 2020 WL 5001785, at *6. A habeas petition is the process by which an individual may challenge the "fact or length" of confinement. *See Preiser v. Rodriguez*, 411 U.S. 475, 494 (1973). To date, the United States Supreme Court has not expressly stated whether a conditions of confinement claim may be raised through a habeas corpus petition. *See Ziglar v. Abbasi*,  137 S.

Ct. 1843, 1862-63 (2017) ("[W]e have left open the question whether [individuals] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus."); *see also Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser*, 411 U.S. at 499 ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."). However, recently the United States Court of Appeals for the Third Circuit recognized the viability of conditions of confinement claims through a § 2241 petition. *See Hope*, 2020 WL 5001785, at *7. In *Hope v. Warden York Cty. Prison*, the Third Circuit held that an immigration detainee's constitutional challenge to their conditions of confinement was "a matter properly challenged by petition for the writ." *Id.* The Third Circuit cautioned, however, that "[i]n recognizing the viability of this § 2241 claim we are not creating a garden variety cause of action." *Id.* Rather, under the "extraordinary circumstances" presented by the COVID-19 pandemic, the petitioners' "§2241 claim seeking release on the basis that unconstitutional conditions require it is not improper." *Id.* (internal quotation marks and citation omitted). Accordingly, I find that subject matter jurisdiction exists to review Petitioner's claims.[6]

## IV.    LEGAL STANDARD

---

[6]     Jurisdiction is also properly laid in this particular court because Petitioner is detained within this district and alleges that his detention violates the Constitution. With exceptions not relevant here, a petitioner may seek § 2241 relief only in the district wherein he or she is held in custody. *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968); *see also United States v. Figueroa*, 349 F. App'x 727, 730 (3d Cir. 2009) (reviewing case law requiring filing in district of confinement); *Gutierrez v. Gonzales*, 125 F. App'x 406, 412 (3d Cir. 2005) (surveying territorial custody requirement in relation to ICE detainees who were removed). That jurisdictional/territorial requirement flows naturally from the nature of a habeas petition, which is directed to the petitioner's custodian and alleges that the custodian is holding the petitioner in violation of the constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c); *Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004) ("Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement.") (citations omitted); *Maleng v. Cook*, 490 U.S. 488, 490 (1989).

The petition and motion for a TRO both seek Petitioner's release from ICE custody during the COVID-19 pandemic. (DE 1 at 31; DE 2 at 43.) As stated previously, I construe Petitioner's motion as a request for a preliminary injunction. *See Hope v. Warden York Cty. Prison*, Civ. No. 20-1784, 2020 WL 1922372, at *2–4 (3d Cir. Apr. 21, 2020); *Ousman D. v. Decker*, Civ. No. 20-2292, 2020 WL 1847704, at *4 (D.N.J. Apr. 13, 2020). Such injunctive relief is an "extraordinary remedy" and "should be granted only in limited circumstances." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir. 1994) (internal quotation marks omitted). In order to obtain a preliminary injunction, the moving party must demonstrate:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted. . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (alteration in original) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)). The movant bears the burden of establishing "the threshold for the first two 'most critical' factors . . . If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

A likelihood of success on the merits requires "a showing significantly better than negligible but not necessarily more likely than not." *See id.* Additionally, the strength of a claim on the merits is in a kind of resonance with the balance of the harms: "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* at 178 (quoting *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)).

## V.     DISCUSSION

Petitioner asserts two causes of action arising under the Fifth and Fourteenth Amendments: a conditions of confinement claim and a deliberate indifference claim. (DE 1 at 29–30.) He submits that these due process violations warrant his immediate release from custody. (*Id.* at 29.) Based upon the evidence presented to the Court, I find that Petitioner has not met the standard for a preliminary injunction.

### A.     Likelihood of Success on the Merits

#### i.     Conditions of Confinement

Petitioner argues that his detention at ECCF, in light of his particular medical vulnerabilities and the ongoing pandemic, is unconstitutionally punitive. (DE 1 at 29; DE 2 at 19.) He submits that Respondents' efforts to prevent the spread of COVID-19 are insufficient and emphasizes alleged inadequacies in ECCF's protocols, such as the failure to provide detainees with masks and the inability of detainees to socially distance. (DE 2 at 27–28.) Moreover, Petitioner argues that the Government's interest in his detention cannot justify detaining a medical vulnerable individual such as himself, especially when he does not present a danger to the community and is not a flight risk. (*Id.* at 29–30.) Respondents assert, however, that ECCF has undertaken significant measures to minimize and contain the spread of COVID-19 and that Petitioner's disagreement with ECCF's response does not demonstrate that the conditions of his confinement amount to punishment. (DE 9 at 27.) Additionally, Respondents argue that Petitioner's detention is rationally related to the Government's legitimate interest in effectuating his final order of removal, protecting the public, and ensuring the management of the detainee population at ECCF. (*Id.* at 21.)

An immigration detainee's conditions of confinement claim is properly analyzed under the Due Process Clause of the Fifth Amendment. *See E.D. v. Sharkey*, 928 F.3d 299, 306–07 (3d Cir. 2019) (holding that immigration detainees are entitled to the "same due process protections" as pretrial detainees). Consistent with due process, "a detainee may not be punished prior to an adjudication of guilt." *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). To determine whether a challenged condition amounts to punishment, a court will consider whether it "is reasonably related to a legitimate government objective." *Sharkey*, 928 F.3d at 307. If it is not, then a court may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflected upon detainees *qua* detainees." *Id.* (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).

Conditions of confinement are "reasonably related" to a legitimate governmental objective if they serve a legitimate purpose and be rationally related to that purpose. *See Hubbard*, 538 F.3d at 232. A challenged condition may amount to impermissible punishment if there is "an expressed intent to punish on the part of detention facility officials," if there is no "alternative purpose to which [the condition of confinement] may rationally be connected is assignable for it," or if the condition is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)).

A recent Third Circuit case has specifically addressed immigration detainees' conditions of confinement claims during the COVID-19 pandemic. *See Hope*, 2020 WL 5001785, at *8–11. In *Hope v. Warden York Cty. Prison,* the Court of Appeals held that a court must examine "the totality of the circumstances" in order to determine whether conditions of confinement are rationally related to a legitimate governmental purpose, or whether they are excessive in relation to that purpose. *Id.* at *9 (citing *Hubbard v. Taylor*, 399 F.3d 150, 159–60 (3d Cir. 2005)). The Court of

Appeals noted that "[i]n assessing whether conditions and restrictions are excessive given their purposes, the courts must acknowledge that practical considerations of detention justify limitations on 'many privileges and rights.'" *Id.* (quoting *Bell*, 441 U.S. at 545–46). The Court also underscored the need to recognize the "legitimate objectives and difficulties of managing a detention facility" and announced a principle of deference to the prison authorities' expertise:

> We defer to administrators on matters of correctional facility administration "not merely because the administrator ordinarily will ... have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government not the Judicial."

*Id.* (quoting *Bell*, 441 U.S. at 520).

Finally, the Third Circuit held that in addressing an immigration detainee's conditions of confinement claim, courts must also recognize the "multiple legitimate governmental objectives, including: (1) ensuring Petitioners' appearances at removal proceedings; (2) protecting the public; and (3) managing the detention facilities." *Id.* Ultimately, in *Hope*, the Third Circuit held that "[c]onsidering all the responsive measures specifically implemented [by those facilities] to detect and to prevent spread of the virus, the challenges of facility administration during an unprecedented situation, and the purposes served by detention," the petitioners had not shown a likelihood of success on their claim that their conditions of confinement constituted punishment. *Id.* at *11.

With these considerations in mind, I turn to the facts of the present case. Here, Petitioner suffers from multiple medical conditions that the CDC has identified as placing him at heightened risk for severe illness if he contracts COVID-19. These conditions include his obesity, COPD, and moderate asthma. *See* Ctrs. for Disease Control and Prevention, *People with Certain Medical Conditions*,     https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-

medical-conditions.html (last visited Sept. 14, 2020). Petitioner also has a history of smoking and suffers from a mental health disorder.  (DE 3 at 9–10.) Petitioner's medical records demonstrate, however, that he is receiving regular care for his medical conditions. (*See generally* DE 10-1.) He has received an inhaler for his asthma and respiratory problems, been encouraged to lose weight, and been prescribed medication to treat his mood disorder. (*Id.* at 132, 224–25.)

While recognizing that Petitioner suffers from these medical vulnerabilities, I also consider the significant measures that ECCF has implemented to minimize and contain infection at its facility. (*See* pp. 5–8, *supra*, for more detail.) Although bunk beds in the individual cells are close together, the central area of the housing unit has sufficient space to practice social distancing. Recreation groups have been modified to limit close interaction between detainees and meals are now furnished to detainees in their cells or the recreation area in order to avoid congregating. Detainees have been educated as to sanitary practices and a "designated detainee" supervised by ECCF staff is tasked with cleaning commonly used items, such as telephones and toilets, in between uses. Detainees have free access to soap and are encouraged to use it. Access to disinfectant agents is controlled, for safety reasons, but it is available.

Medical care complies with CDC guidelines. Surgical masks are issued, not to everyone, but to those with symptoms suggesting COVID-19. Those with moderate to severe symptoms are sent to the hospital; those with mild symptoms are quarantined. Symptomatic persons are immediately placed on anti-viral medications and their vitals are monitored daily. Detainees who may have been exposed to a confirmed case are "cohorted" for fourteen days to prevent any further spread. Detainees with health conditions identified by the CDC as high risk are housed separately; individuals with "well-controlled" chronic conditions, however, remain in general population.

Petitioner argues, however, that there are "numerous, specific deficiencies" within ECCF's protocols which render the measures inadequate to protect medically vulnerable individuals. (DE 11 at 5.) Some of those deficiencies include: the inability to socially distance inside cells; the failure of ECCF staff to enforce social distancing in common areas; the failure to provide masks to all detainees; the absence of adequate diagnostic testing and reliance on quarantine and cohorting practices; and the failure to provide additional protections for medically vulnerable individuals. (*Id.* at 5–7.) However, the Third Circuit has warned of making "ideal" scenarios a "*sine qua non* of constitutional detention." *Hope*, 2020 WL 5001785, at *10. Rather, deference must be given to "administrators on matters of correctional facility administration." *Id.* at *9. Indeed, the CDC has recognized that certain measures, such as social distancing and widespread testing, may not be practicable at each facility. *See* Ctrs. for Disease Control and Prevention, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Sept. 14, 2020) (stating that social distancing at detention facilities may not always be possible and that social distancing strategies "will need to be tailored to the individual space in the facility and the needs of the population and staff"); Ctrs. for Disease Control and Prevention, *Testing in Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html#ftn1 (last visited Sept. 14, 2020) (stating that implementation of testing "should be guided by what is feasible, practical, and acceptable, and should be tailored to the needs of each facility"). Yet, ECCF appears to be following a majority of the CDC guidance for detention and correctional centers. *Compare* (DE 9-5), *with* Ctrs. for Disease Control and Prevention, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-

detention/guidance-correctional-detention.html (last visited Sept. 14, 2020). Where certain measures are not feasible, such spacing bunk beds six feet apart, ECCF has created a "workaround" by "skipping over beds" where possible. (DE 9-5 at 2.)

I have remarked in prior, pre-*Hope* decisions that the Court is interested in results; with the best will in the world, a prison might find itself simply unable to contain a dangerous outbreak. Fortunately, we are no longer where we were in March-April 2020. For 12 weeks, ECCF has reported no new positive cases among detainees. There have been no new reported cases among inmates for the past six weeks, among correctional staff for the past two weeks, or among civilian staff for at least 15 weeks. To be sure, it is possible for the Court to criticize the adequacy of certain measures; to be sure, anything less than daily testing of 100% of the detainees leaves open the possibility of undetected, asymptomatic, yet contagious cases. Still, these results speak persuasively to the effectiveness of the institution's response.[7]

Furthermore, Respondents also have a legitimate interest in Petitioner's continued detention. "Detention of aliens pending their removal in accordance with the INA is constitutional and is supported by legitimate governmental objectives." *Hope*, 2020 WL 5001785, at *11 (citing *Demore v. Kim*, 538 U.S. 510, 531 (2003); *Wong Wing v. United States*, 163 U.S. 228, 235 (1896)). Such objectives include enforcing immigration laws, protecting the community, and preventing individuals from absconding. *See Jorge V. S. v. Green*, Civ. No. 20-3675, 2020 WL 1921936, at *4 (D.N.J. Apr. 21, 2020); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) (stating that detention can ensure a detainee does not abscond or engage in criminal activity before a final

---

[7]    Moreover, these trends do not seem to be outliers; they parallel a dramatic drop in the rate of infection in New Jersey generally. From a peak in the neighborhood of 4,000 new cases or more per day in mid-April 2020, New Jersey is now reporting numbers in the 400-500 range, and fatalities have plunged dramatically. *See* New Jersey COVID-19 Information Hub, https://covid19.nj.gov (last visited September 14, 2020). I do not mean to imply, of course, that we have put the pandemic behind us; far from it.

determination as to their immigration status can be made); *Zadvydas v. Davis*, 533 U.S. 678, 690–91 (2001) (identifying "ensuring the appearance of aliens at future immigration proceedings" and "protecting the community" as governmental objectives).

In this case, the Petitioner has twice been released on bond and both times he has been reincarcerated based on his arrests for new offenses. He is subject to a final order of removal, but has twice been cited for refusal to comply with ICE's efforts to remove him, seemingly prolonging the detention until such time as ICE may accomplish the removal by force. *See* p. 3, *supra*. An IJ has found that he not only presents a danger to the community, but also presents a risk of flight. In such a case, the detention is not disproportionate to the legitimate interests of the government.

Accordingly, in "[c]onsidering all the responsive measures specifically implemented to detect and to prevent spread of the virus, the challenges of facility administration during an unprecedented situation, and the purposes served by detention," I do not find that Petitioner's confinement is tantamount to punishment, and he has not demonstrated a likelihood of success on the merits of his conditions of confinement claim. *Hope*, 2020 WL 5001785, at *11.

## ii. *Inadequate Medical Care*

Petitioner also argues that Respondents have acted with deliberate indifference towards his serious medical needs failing to release him from custody. (DE 1 at 29.) Petitioner states that Respondents are aware of the serious risk posed by the virus but have failed to take the only action that can address his medical needs–his release. (*Id.* at 29–30.) Respondents maintain, however, that the Third Circuit in *Hope* has rejected the argument that a facility must eliminate all possible risk of COVID-19. (DE 9 at 30.) Respondents also assert that Petitioner has failed to show any denial of medical care, as he is being treated regularly for his health conditions. (*Id.* at 29–30.)

The applicable legal standard for an immigration detainee's inadequate medical care claim is that of deliberate indifference. *See Hope,* 2020 WL 5001785, at *12; *Harvey v. Chertoff*, 263 F. App'x 188, 191 (3d Cir. 2008) (citing *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581-85 (3d Cir. 2003)). "To establish deliberate indifference, Petitioners must show the Government knew of *and disregarded* an excessive risk to their health and safety." *Hope*, 2020 WL 5001785, at *12 (emphasis in original). Significantly, "[w]here a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017) (citing *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993)).

Within the context of COVID-19, the Third Circuit has stated that the Government is not constitutionally required to entirely eliminate a detainee's risk of contracting the virus. *Hope*, 2020 WL 5001785, at *12. "[A] failure to eliminate all risk [of infection does not] establish that the Government was deliberately indifferent to [a detainee's] serious medical needs." *Id.* at *13. Moreover, "'mere disagreement' as to the response to the risk to Petitioners in light of their medical condition" is also insufficient to establish a constitutional infringement. *Id.* at *12 (quoting *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987)).

Here, Petitioner's argument requires Respondents to either eliminate any risk of COVID-19 at ECCF, or release him from detention. However, as the Third Circuit held in *Hope*, this is not the constitutional standard. ECCF has enacted significant measures to prevent the spread of COVID-19. They have undertaken efforts to permit social distancing, increase general cleaning of the facility, monitor detainees' health, and provide ongoing medical treatment, including testing, to detainees who exhibit symptoms consistent with COVID-19. (*See generally* DE 9-5.) Moreover, Petitioner has been receiving regular care and treatment for his health conditions. These actions

by Respondents do not demonstrate a reckless disregard for the serious threat that COVID-19 poses or Petitioner's health issues. Although Petitioner may disagree as to the response taken by ECCF and the Government, that does not establish a constitutional infringement. *See Hope*, 2020 WL 5001785, at *12. Accordingly, I find that Petitioner has not shown that Respondents have evinced deliberate indifference towards his serious medical needs and he has likewise not demonstrated a likelihood of success on the merits of his claim.

**B.      Irreparable Harm**

The second factor in determining whether an individual is entitled to a preliminary injunctive relief requires the moving party to show that he is "more likely than not to suffer irreparable harm" absent the relief requested. *Reilly*, 858 F.3d at 179. Petitioner argues that "[t]he risk . . . of contracting a potentially deadly respiratory virus for which there is no vaccine or cure, is an imminent irreparable harm." (DE 2 at 39–40.) He submits that, if released, he plans to reside at his brother's private home in Monmouth County, New Jersey where he would be able to isolate, have access to protective equipment such as masks, and have access to local physicians and hospitals if needed. (DE 1 at 24; DE 11 at 10.) Petitioner states that his likelihood of contracting COVID-19 while at home with his brother is drastically lower than his likelihood of contracting COVID-19 at ECCF. (DE 2 at 40.) However, Respondents assert that the Third Circuit has rejected the bare argument that contracting COVID-19 would constitute irreparable harm because individuals can contract the virus whether they remain detained or are released. (DE 9 at 31.) Respondents submit that Petitioner here has failed to show irreparable harm because he has not indicated how the conditions at ECCF would compare to his conditions if released. (*Id.*)

As Respondents correctly point out, the Third Circuit has held that the argument that detainees face irreparable harm should they contract the virus is not sufficient, standing alone, to

demonstrate irreparable harm because "it applies regardless whether Petitioners are detained or released." *Hope*, 2020 WL 5001785, at *13. Rather, the Third Circuit stated, courts should engage in a more particularized inquiry, addressing concerns such as an individual's medical risks, healthcare access needs, detention conditions, and release circumstances. *Id.* "In other words, were [the petitioners] more likely to contract the virus [if released] than if they remained detained?" *Id.*

Here, Petitioner does allege that, if released, he will be less likely to contract COVID-19 because he will be able to self-quarantine in his brother's home and no longer be exposed to "dozens of unrelated individuals who could potentially transmit COVID-19." (DE 11 at 10.) Comparatively, at ECCF, Petitioner is unable to socially distance himself from his cellmate. Director Ortiz's declaration indicates that bunk beds within cells are not spaced six feet apart. As a result of this, Petitioner states that even if he were to stay inside his cell all day to avoid interaction with others, he would still be unable to protect himself from his cellmate.

Petitioner also states that, if released, he will also have access to a face mask. (DE 11 at 10.) While the State of New Jersey has mandated that individuals wear face coverings while in public and unable to socially distance, detainees at ECCF have not been provided with masks and Petitioner is therefore unable to engage in this preventative measure. *See* N.J. Exec. Order No. 163 (Jul. 8, 2020), https://nj.gov/infobank/eo/056murphy/pdf/EO-163.pdf.

Petitioner also contends that if released he will have access to a private physician and a local hospital. (DE 11 at 10.) This availability of medical care is similar to what Petitioner receives at ECCF where he has regular access to medical treatment and a local hospital if needed.[8] Although

---

[8]     I also note that the number of cases in Monmouth County, where Petitioner would reside if released, is notably fewer than the number of cases in Essex County where Petitioner is detained. *See* N.Y. Times, *New Jersey Coronavirus Map and Case Count* https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html (last visited Sept. 11, 2020)*; see also Hope*, 2020 WL 5001785, at *13 (questioning the prevalence of COVID-19 in petitioners' home communities).

no one is safe from COVID-19 transmission, I find that under the circumstances in this case, Petitioner is more likely to contract the virus if detained than is he is released.[9]

Although Petitioner has shown he will more likely than not suffer irreparable harm absent the relief request, he has not demonstrated a likelihood of success on the merits of his claims. Thus, since he has not met the threshold showing of *both* "gateway factors" required for a preliminary injunction, I need not address the remaining two factors – the possibility of harm to other interested persons from the grant or denial of the injunction and the public interest. *See Reilly*, 858 F.3d at 179 (holding that a court considers the final two factors only if the first two "gateway factors are met"); *see also Emerson O. C.-S. v. Anderson*, Civ. No. 20-3774, 2020 WL 1933992, at *7 (D.N.J. Apr. 22, 2020) (declining to address remaining preliminary injunction factors after determining that movant had not demonstrated a likelihood of success on the merits of his claim).

Petitioner's § 2241 and motion for a TRO will both be denied.

## CONCLUSION

For the foregoing reasons, the petition (DE 1) and motion for a temporary restraining order, construed as a motion for a preliminary injunction (DE 2), are denied. An appropriate order follows.

DATED: September 14, 2020

/s/ Kevin McNulty

_____

KEVIN MCNULTY
United States District Judge

---

[9]     Any finding of irreparable harm, however, is tinged by a sense that the harm, or at least its continuation, is self-inflicted. As noted above, the Petitioner has been slated for removal—actual removal, of course, being the event that would end the detention in the normal course—and has twice been cited for refusal to comply with administrative requirements. *See* p. 3, *supra*. It may be that he prefers detention at ECCF, even under present conditions, to deportation, but that is not a preference that should figure in the Court's analysis.